**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN 249203)
ak@kazlg.com
Mona Amini (SBN 296829)
mona@kazlg.com
Gil Melili, Esq. (SBN 337116)
gil@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**HAMMONDLAW, P.C.**
Julian Hammond (SBN 268489)
jhammond@hammondlawpc.com
Polina Brandler (SBN 269086)
pbrandler@hammondlawpc.com
Ari Cherniak (SBN 290071)
acherniak@hammondlawpc.com
Adrian Barnes (SBN 253131)
abarnes@hammondlawpc.com
1201 Pacific Ave, Suite 600
Tacoma, Washington 98402
Telephone: (310) 601-6766
Facsimile: (310) 295-2385

*Attorneys for Plaintiffs and the Proposed Class*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF ALAMEDA – COMPLEX CIVIL**

| | |
|---|---|
| IN RE LIFELONG MEDICAL CARE DATA BREACH LITIGATION | Lead Case No. RG21113030 |
| | FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF: |
| | 1. CALIFORNIA CUSTOMER RECORDS ACT (CAL. CIV. CODE § 1798.80, *et seq*., § 1798.82) |
| | 2. CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIV. CODE §§ 56, *et seq*. (Unauthorized Disclosure of Medical Information); |
| | 3. CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIV. CODE §§ 56, *et seq*. (*Failure to Preserve Confidentiality of Medical Information*); |
| | 4. CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE §§ 17200, *et. seq*.; |
| | 5. BREACH OF CONTRACT; |
| | 6. BREACH OF IMPLIED CONTRACT and |
| | 7. NEGLIGENCE |

1  DEMAND FOR JURY TRIAL

2

3

4

5

6

7

8

9    Plaintiffs Noem Margolies, Herman Cowan, and Mary Scott ("Plaintiffs"), individually and

10  on behalf of the general public and all others similarly situated (the "Class members"), by and through

11  Plaintiffs' attorneys, upon personal knowledge as to facts pertaining to themselves and on information

12  and belief as to all other matters, bring this class action against Defendant Lifelong Medical Care

13  ("Lifelong" or "Defendant") and DOES 1-50, inclusive, and allege as follows:

14                            **NATURE OF THE CASE**

15          1.      This is a data breach class action arising out of Defendant's failure to implement and

16  maintain reasonable security practices to protect consumers' sensitive personal information.

17  Defendant is a healthcare provider that has served patients for over 45 years.[1] For its business

18  purposes, Defendant obtains, stores, and transmits personally identifiable information ("PII") and

19  protected health information ("PHI") from patients like Plaintiffs, including but not limited to

20  patients' names, addresses, social security numbers, dates of birth, patient cardholder numbers,

21  telephone numbers, healthcare account numbers and balances, and treatment/diagnosis information.

22          2.      On November 24, 2020, Netgain Technology, LLC ("Netgain"), a third-party vendor

23  that provided IT services to Defendant, discovered anomalous network activity and determined it was

24  a victim of a ransomware attack. On February 25, 2021, Netgain's investigation determined that

25  certain files (which included Plaintiffs' and the Class members' PII/PHI were accessed and/or

26  acquired without authorization.

27

28

---

[1]      https://lifelongmedical.org/about-us/

KAZEROUNI
LAW GROUP, APC

3.     Defendant did not obtain authorization to disclose Plaintiffs' and the Class members PII/PHI to Netgain; and Defendant failed to ensure that Plaintiffs' and the Class members' PII/PHI would be appropriately safeguarded by Netgain.

4.     Defendant conducted its own investigation, and on August 9, 2021, Defendant determined that unauthorized users had accessed and/or acquired certain patients' PII and PHI from Netgain's network, including individuals' full names, social security numbers, dates of birth, patient cardholder numbers, and/or treatment/diagnosis information (the "Data Breach").[2] Although the exact number of affected patients is presently unknown, based upon information and belief at least 115,448 patients have been affected by the Data Breach. The Data Breach occurred on or around November 24, 2020. However, Defendant only provided notice to Plaintiffs and its other patients impacted by the Data Breach on or around August 24, 2021.

5.     Although Defendant knew about the Data Breach and that sensitive patient information was in the hands of malicious actors, it waited until on or around August 24, 2021, to send Plaintiffs and other similarly situated patients letters regarding the Data Breach. Defendant's notice to patients was misleading and inadequate as the notice did not explain the ***nine-month delay*** between the discovery of the Data Breach and the notice being mailed to affected patients.

6.     This action seeks to remedy Defendant's failure to safeguard Plaintiffs' and the Class' PII and PHI. Plaintiffs bring this action on behalf of themselves individually and all other persons impacted by the Data Breach.

7.     As set forth in the Prayer for Relief, among other things, Plaintiffs seek, for themselves and the Class, injunctive relief, including public injunctive relief, actual damages, nominal damages, and restitution.

---

[2]    *See* https://lifelongmedical.org/wp-content/uploads/2021/08/LifeLong-Medical-Care-Notice-of-Data-Security-Incident.pdf. A copy of the Notice of Data Security Incident posted by Defendant on its website, dated August 24, 2021, is attached hereto as **Exhibit A**.

**VENUE AND JURISDICTION**

8.    This Court has jurisdiction over this action pursuant to Cal. Code Civ. Proc. § 410.10 and Cal. Bus. & Prof. Code §§ 17203-17204, 17604. This action is brought as a class action on behalf of Plaintiffs and the Class members pursuant to Cal. Code Civ. Proc. § 382.

9.    This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in California and is headquartered in Berkeley, California.

10.   Venue is proper in this Court pursuant to Cal. Code Civ. Proc. § 395 and § 395.5 because Defendant regularly conducts business in the State of California, Defendant is headquartered in Berkeley, California, and the unlawful acts or omissions giving rise to this action also occurred or arose in this county.

**PARTIES**

11.   At all relevant times, Plaintiff Margolies resided in the State of California.

12.   At all relevant times, Plaintiff Cowan resided in the State of California.

13.   At all relevant times, Plaintiff Scott resided in the State of California.

14.   At all relevant times, Defendant conducted business in the State of California.

15.   Plaintiffs provided PII/PHI to Defendant, and Defendant collected and maintained certain PII/PHI related to Plaintiffs, including but not limited to each Plaintiff's name, address, social security number, date of birth, patient cardholder number, and medical treatment/diagnosis information.

16.   On August 24, 2021, Plaintiffs were notified that their PII/PHI was accessed, viewed, and/or acquired by unauthorized individuals through the Data Breach.

17.   Defendant sent Plaintiffs a letter dated August 24, 2021, with the title, "*IMPORTANT INFORMATION PLEASE REVIEW CAREFULLY*" (the "Letter").[3] The Letter notified Plaintiffs and similarly situated persons that as a result of the Data Breach a malicious actor had gained unauthorized access to certain PII/PHI in Netgain's network containing individuals' PII and PHI, including full name, social security number, date of birth, patient cardholder numbers, and/or treatment/diagnosis

---

[3]    An exemplar of the Letter is attached hereto as **Exhibit B.**

information.  No details were provided regarding the details of the ransomware attack, who stole the information, whether a ransom was paid, if Plaintiffs' and the Class members' PII/PHI was recovered, or why there was a significant delay in Defendant notifying Plaintiffs and other affected patients.

18.     As a result of Defendant's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the personal information it collected, maintained, and stored on its servers, network, and/or email system, Plaintiffs' PII/PHI was accessed, viewed, exfiltrated, stolen and/or otherwise disclosed to unauthorized persons in the Data Breach.

19.     Defendant is a California company formed under the laws of the State of California with a headquarters located at 2344 6th Street, Berkeley, California 94710. Defendant is a medical provider that offers medical, dental, and social services.

20.     Plaintiffs are unaware of the true names and capacities of the Defendant sued herein as DOES 1 through 50, inclusive, and therefore sue this Defendant by such fictitious names pursuant to Cal. Civ. Proc. Code § 474. Plaintiffs are informed and believes, and based thereon, allege that Defendant designated herein is legally responsible in some manner for the unlawful acts and occurrences complained of herein, whether such acts were committed intentionally, negligently, recklessly, or otherwise, and Defendant thereby proximately caused the injuries and damages to Plaintiffs and the Class members as herein alleged. Plaintiffs will seek leave of Court to amend this complaint to reflect the true names and capacities of Defendant when they have been ascertained and become known.

21.     The agents, servants and/or employees of Defendant and each of them acting on behalf of Defendant acted within the course and scope of his, her or its authority as the agent, servant and/or employee of Defendant, and personally participated in the conduct alleged herein on behalf of Defendant with respect to the conduct alleged herein. Consequently, the acts of each Defendant are legally attributable to the other Defendants and all Defendants are jointly and severally liable to Plaintiffs and other similarly situated individuals, for the loss sustained as a proximate result of the conduct of the Defendants' agents, servants and/or employees.

# FACTUAL ALLEGATIONS

## *PII/PHI Is a Valuable Property Right that Must Be Protected*

22.     The California Constitution guarantees every Californian a right to privacy. PII/PHI is a recognized valuable property right.[4] California has repeatedly recognized this property right, most recently with the passage of the California Consumer Privacy Act of 2018.

23.     In a Federal Trade Commission ("FTC") roundtable presentation, former Commissioner, Pamela Jones Harbour, underscored the property value attributed to PII by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[5]

24.     The value of PII as a commodity is measurable. "PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[6] It is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-market" for several years.

25.     Companies recognize PII as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market.[7]

26.     As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals openly post credit card numbers, Social Security numbers, PII and other sensitive information directly on various illicit Internet websites making the information publicly available for other criminals to take and use. This information from various breaches, including the information

---

[4]     *See* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *2 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[5]     FTC, *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable) (Dec. 7, 2009), https://www.ftc.gov/public-statements/2009/12/remarks-ftc-exploring-privacy-roundtable.

[6]     *See* Soma, *Corporate Privacy Trend, supra*.

[7]     Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessmenttool.html.

KAZEROUNI LAW GROUP, APC

exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims. In one study, researchers found hundreds of websites displaying stolen PII and other sensitive information. Strikingly, none of these websites were blocked by Google's safeguard filtering mechanism – the "Safe Browsing list."

27.     PHI is particularly valuable. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security numbers and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[8] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen social security or credit card number.[9]

28.     Recognizing the high value that consumers place on their PII/PHI, some companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information they share – and who ultimately receives that information. By making the transaction transparent, consumers will make a profit from the surrender of their PII/PHI.[10] This business has created a new market for the sale and purchase of this valuable data.[11]

29.     Consumers place a high value not only on their PII/PHI, but also on the privacy of that data. Researchers shed light on how much consumers value their data privacy – and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and

---

[8]     Adam Greenberg, *Health Insurance Credentials Fetch High Prices in the Online Black Market* (July 16, 2013), *available at* https://www.scmagazine.com/home/security-news/health-insurance-credentials-fetch-high-prices-in-the-online-black-market/.

[9]     Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014) *available at* https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[10]     Steve Lohr, *You Want My Personal Data? Reward Me for It*, N.Y. Times (July 16, 2010) *available at* https://www.nytimes.com/2010/07/18/business/18unboxed.html.

[11]     *See* Julia Angwin and Emil Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb.            28,            2011)            *available            at* https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

1   accessible, some consumers are willing to pay a premium to purchase from privacy protective

2   websites."[12]

3         30.    One study on website privacy determined that U.S. consumers valued the restriction

4   of improper access to their PII between $11.33 and $16.58 per website.[13]

5         31.    Given these facts, any company that transacts business with a consumer and then

6   compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary

7   value of the consumer's transaction with the company.

8                 ***Theft of PII/PHI Has Grave and Lasting Consequences for Victims***

9         32.    A data breach is an incident in which sensitive, protected, or confidential data has

10   potentially been viewed, stolen, or used by an individual unauthorized to do so. As more consumers

11   rely on the internet and apps on their phone and other devices to conduct every-day transactions, data

12   breaches are becoming increasingly more harmful.

13         33.    Theft or breach of PII/PHI is serious. The California Attorney General recognizes that

14   "[f]oundational" to every Californian's constitutional right to privacy is "information security: if

15   companies collect consumers' personal data, they have a duty to secure it. An organization cannot

16   protect people's privacy without being able to secure their data from unauthorized access."[14]

17         34.    The United States Government Accountability Office noted in a June 2007 report on

18   Data Breaches ("GAO Report") that identity thieves use PII to take over existing financial accounts,

19   open new financial accounts, receive government benefits and incur charges and credit in a person's

20   name.[15] As the GAO Report states, this type of identity theft is so harmful because it may take time

21   for the victim to become aware of the theft and can adversely impact the victim's credit rating.

22

23

24

---

25   [12]    Janice Y. Tsai, et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study Information Systems Research* 22(2) 254, 254 (June 2011), *available at*
26   https://www.jstor.org/stable/23015560?seq=1#page_scan_tab_contents.
   [13]    II–Horn, Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation*
27   (Mar. 2003) at table 3, *available at* https://ideas.repec.org/p/wpa/wuwpio/0304001.html.
   [14]    California Data Breach Report, Kamala D. Harris, Attorney General, California Department
28   of Justice, February 2016.
   [15]    *See* GAO, GAO Report 9 (2007), *available at* http:///www.gao.gov/new.items/d07737.pdf.

KAZEROUNI
LAW GROUP, APC

35.     In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records … [and their] good name." According to the FTC, identity theft victims must spend countless hours and large amounts of money repairing the impact to their good name and credit record.[16]

36.     Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[17] According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver license or ID; use the victim's information in the event of arrest or court action.[18]

37.     According to the IBM and Ponemon Institute's 2019 "Cost of a Data Breach" report, the average cost of a data breach per consumer was $150 per record.[19] Other estimates have placed the costs even higher. The 2013 Norton Report estimated that the average cost per victim of identity theft – a common result of data breaches – was $298 dollars.[20] And in 2019, Javelin Strategy &

---

[16]     *See* FTC Identity Theft Website: https://www.consumer.ftc.gov/features/feature-0014-identity-theft.

[17]     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer, or taxpayer identification number." *Id*.

[18]     *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, EXPERIAN (Sept. 7, 2017), *available at* https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[19]     Brook, *What's the Cost of a Data Breach in 2019*, *supra*.

[20]     Norton By Symantec, 2013 Norton Report 8 (2013), *available at* https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf.

Research compiled consumer complaints from the FTC and indicated that the median out-of-pocket cost to consumers for identity theft was $375.[21]

38.     The consequences can be even more serious when the hack includes taking PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[22] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[23] "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[24]

39.     Further, medical data is more valuable than other commonly available personal data. "While a stolen credit card number might be sold for just a few cents, medical files can be worth as much as $1,000 each" or more.[25]

40.     A report published by the World Privacy Form and presented at the U.S. FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.
- Significant bills for medical goods and services not sought nor received.
- Issues with insurance, co-pays, and insurance caps.
- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.
- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the

---

[21]     Facts + Statistics: *Identity Theft and Cybercrime*, Insurance Information Institute, *available at* https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (citing the Javelin report).

[22]     Pam Dixon, et al., *The Geography of Medical Identity Theft* (Dec. 12, 2017), https://www.ftc.gov/system/files/documents/public_comments/2018/01/00037-142815.pdf.

[23]     *See* FBI Cyber Division, (U) Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain 2 (2014), *available at* https://publicintelligence.net/fbi-health-care-cyber-intrusions/ (FBI, April 8, 2014).

[24]     *See* Federal Trade Commission, *Medical Identity Theft*, *available at* http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

[25]     Brian O'Connor, *Healthcare Data Breach: What to Know About Them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

KAZEROUNI LAW GROUP, APC

imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- • As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.
- • Phantom medical debt collection based on medical billing or other identity information.
- • Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.

41. A person whose PII/PHI has been compromised may not see any signs of identity theft for years. According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

42. For example, in 2012, hackers gained access to LinkedIn's users' passwords. However, it was not until May 2016, four years after the breach, that hackers released the stolen email and password combinations.[26]

43. It is within this context that Plaintiffs and over 115,000 of Defendant's patients face imminent risk of identity theft and must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken, accessed, and viewed by unauthorized persons willing and able to use the information for any number of improper purposes and scams, including making the information available for sale on the dark web or the black market.

***Defendant's Business***

44. Defendant is a healthcare provider that provides medical, dental, and social services to its patients.

45. When Plaintiffs and similarly situated patients received medical treatment from Defendant, they are required to provide Defendant with certain personal information. This personal information includes the patient's name, Social Security number, date of birth, patient cardholder number, insurance information, and other medical information related to their medical condition,

---

[26] *See* Cory Scott, *Protecting Our Members*, LINKEDIN (May 18, 2016), *available at* https://blog.linkedin.com/2016/05/18/protecting-our-members.

diagnosis, and treatment. Plaintiffs reasonably believed that Defendant would keep Plaintiffs' PII/PHI secure.

### *Defendant's Collection of Patients' PII/PHI*

46.     Defendant acknowledges that it obtains, stores and transmits a substantial amount of personal  and medical information from its patients. The type of information is detailed in Defendant's Privacy Policy (last updated August 2021),[27] which states that Defendant collects the following categories of personal information from patients:

> Personal Data (Any information that directly, indirectly, or in connection with other information — including a personal identification number — allows for the identification or identifiability of a natural person); Usage Data; Tracker; unique device identifiers for advertising (Google Advertiser ID or IDFA, for example); email address; first name; last name; phone number; Data communicated while using the service.

### *Defendant's Promises to Safeguard Patient PII/PHI*

47.     Defendant promises that it "takes appropriate security measures to prevent unauthorized access, disclosure, modification, or unauthorized destruction of the Data."[28]

48.     Defendant claims it uses "industry standard physical, technical and administrative security measures and safeguards to protect the confidentiality and security of your personal information."[29]

49.     Defendant warns that "since the Internet is not a 100 percent secure environment, we cannot guarantee, ensure, or warrant the security of any information you transmit to us.  There is no guarantee that information may not be accessed, disclosed, altered, or destroyed by breach of any of our physical, technical, or managerial safeguards.  It is your responsibility to protect the security of your login information."

---

[27]     *See* Defendant's Privacy Policy, *available at* https://lifelongmedical.org/privacy-policy-2/. A copy of Defendant's Privacy Policy is attached hereto as **Exhibit C**.
[28]     https://lifelongmedical.org/privacy-policy-2/#california_info.
[29]     *Id*.

50.     Defendant's Terms of Use expressly references Defendant's Privacy Policy.

***The Data Breach***

51.     On August 24, 2021, Defendant sent Plaintiffs and other similarly situated patients a Letter with the title, "*IMPORTANT INFORMATION PLEASE REVIEW CAREFULLY.*" The Letter stated, "We are writing with important information regarding a recent security incident that occurred at Netgain, a third-party vendor that provides services to certain healthcare providers, including LifeLong Medical Care." An exemplar of the Letter is attached hereto as **Exhibit B** (the "Letter").

52.     The Letter went on to state that a ransomware attack occurred November 24, 2020 and that on February 25, 2021, Netgain's investigation determined that certain files were accessed and or acquired including Defendant's.  Further the Letter stated that, subsequently, Defendant LifeLong "conducted a thorough review of the contents of the acquired files to determine if they contained any sensitive information."

53.     Also on August 24, 2011, LifeLong posted a Notice to its website entitled: "LifeLong Medical Care Provides Notice of Netgain Data Security Incident" (hereinafter "Website Notice"). The Website Notice gave greater detail about the information released through the data breach. The Website Notice stated that:

> "certain identifiable personal and protected health information was accessed and/or acquired from Netgain's network in connection with this incident, including full names and one or more of the following: Social Security numbers, dates of birth, patient cardholder numbers, and/or treatment/diagnosis information."

A copy of the Notice of Data Security Incident posted by Defendant on its website, dated August 24, 2021, is attached hereto as **Exhibit A**.

54.     In the Letter, Defendant offered patients a one-year complimentary membership to Equifax's Credit Watch Gold identity theft program.

55.     Additionally, in the Letter, Defendant offered a limited number of steps on how to protect against identity theft and fraud. These steps included reviewing financial account statements and credit reports.

56.     Based upon the information posted on the U.S. Department of Health and Human Services' (HHS) official website, on 08/25/2021, Defendant reported to the HHS Office for Civil Rights that the Data Breach described herein as affecting **115,448 persons**.

57.     The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, requires HIPAA covered entities to provide notification following a breach of unsecured protected health information. Following a breach of unsecured protected health information, covered entities must provide notification of the breach to affected individuals. Covered entities must *only* provide the required notifications if the breach involved unsecured protected health information. Unsecured protected health information is protected health information that has not been rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the Secretary of the U.S. Department of Health and Human Services in guidance. Under approved guidance of the U.S. Department of Health and Human Services, protected health information ("PHI") is rendered unusable, unreadable, or indecipherable to unauthorized individuals if (1) electronic PHI has been encrypted as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304 definition of encryption) and (2) such confidential process or key that might enable decryption has not been breached.

58.     By reporting the Data Breach discussed herein to the U.S. Department of Health and Human Services and by sending its Letter providing notice of the Data Breach, Defendant determined and has effectively affirmed that Plaintiffs' and the Class' electronic PII/PHI was either not encrypted at all, or if it was encrypted, the encryption has been breached, exfiltrated, and was able to be viewed by the unauthorized third party. Further, because Plaintiffs and the Class' identifiable medical information contained in Netgain's network server was not rendered unusable, unreadable, or indecipherable, the unauthorized third party or parties who accessed and/or exfiltrated Plaintiffs' and the Class' PII/PHI was able to and did in fact view Plaintiffs and the Class members' PII/PHI.

### *Defendant's Notice of Data Breach*

59.     On or around August 24, 2021, Defendant sent Plaintiffs and other similarly situated patients affected by the Data Breach the data breach notification letter referenced above (the "Letter").

60.     Pursuant to California Civ. Code § 1798.82(a)(1), data breach notification letters must be sent to residents of California "whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person" due to a "breach of the security of the system[.]"

61.     Plaintiffs and the Class members' PII/PHI is "personal information" as defined by California Civ. Code § 1798.82(h).

62.     California Civ. Code § 1798.82(g) defines "breach of the security of the system" as the "unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of personal information maintained by the person or business."

63.     The Data Breach was a "breach of the security of the system" as defined by California Civ. Code § 1798.82(g).

64.     Thus, Defendant filed and disseminated its breach notification Letter because Plaintiffs and the Class members' unencrypted PII/PHI was disclosed, accessed, and viewed by an unauthorized person or persons as a result of the Data Breach.

65.     Defendant's Notice of the Data Breach letter sent to Plaintiffs and other putative Class members is inadequate and fails to provide sufficient detail. Defendant states only that "[o]n November 24, 2020, Netgain discovered anomalous network activity. Through Netgain's investigation, it was later determined that Netgain was the victim of a ransomware attack" and that "[o]n February 25, 2021, Netgain's investigation determined that certain files were accessed and/or acquired without authorization" and thus Defendant "[t]hereafter . . . conducted a thorough review of the contents of the acquired files to determine if they contained any sensitive information" through which Defendant then identified that Plaintiffs' and other putative class members' PII and/or PHI had been compromised. It is unclear whether the intrusion, or intrusions, occurred on separate days or every day or for how long. It also fails to indicate whether the breach was only of existing patient PII/PHI or whether it also included PII/PHI collected from former and/or potential patients.

66.     Defendant's vague description of the Data Breach leaves Plaintiffs and Class members at continuing risk. By failing to adequately inform Plaintiffs and Class members of the specific details

1   surrounding the breach Plaintiffs and Class members are unable to adequately protect themselves

2   against identity theft and other damages.

3       67.     Further, Defendant offered Plaintiffs and Class members little to assist them with any

4   fall-out from the Data Breach or to advise them of the extent of the potential threat they face as a

5   result of their sensitive PII/PHI being in the hands of criminals. Defendant's offer of a one-year

6   subscription to Equifax's Credit Watch Gold identity theft protection program is insufficient where

7   Plaintiffs and Class members are now at imminent and continued increased risk of identity theft for

8   years to come as a result of the Data Breach.

9       68.     Defendant also fails to explain why it waited so to notify Plaintiffs and Class members

10  about the Data Breach. This delayed Plaintiffs' and Class members' ability to take necessary

11  precautions to protect themselves from identity theft and other fraud.

12          ***Defendant Knew or Should Have Known PII/PHI Are High Risk Targets***

13      69.     Defendant knew or should have known that PII and PHI like the information obtained,

14  maintained and stored on Defendant's servers and network, including its email system, is a high-risk

15  target for identity thieves.

16      70.     The Identity Theft Resource Center reported that the business sector had the largest

17  number of breaches in 2018. According to the ITRC this sector suffered 571 data breaches exposing

18  at least 415,233,143 million records in 2018.[30] Further, the ITRC identified "hacking" as the most

19  common form of data breach in 2018, accounting for 39% of data breaches.

20      71.     Companies are increasingly being targeted with phishing attacks. A phishing attack is

21  a method of infiltrating for the purpose of removing data for the purpose of viewing and using it to

22  commit acts such as identity theft and otherwise wrongfully obtaining money or other things of value.

23  Sometimes the person who engaged in phishing uses the data obtained to commit cyber fraud and

24  sometime the person sells the data to other identity thieves. Either way, the information must be

25  viewed to be of any use or to confirm the contents of the data before being sold.

26

27

28  [30]  Identity Theft Resource Center, *2018 End-of-Year Data Breach Report*, *available at*
    https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-
    Aftermath_FINAL_V2_combinedWEB.pdf.

72.     Phishing is a cybercrime in which a target or targets are contacted by email, telephone or text message by someone posing as a legitimate person or entity so that the recipient provides sensitive data. The hacker cannot do it by him or herself. A phishing incident requires the email system to allow the phishing email to reach the email recipient, for the email recipient to click on a link, provide login credentials, download a file, or take similar affirmative action to allow the hacker to compromise the email recipient's system. The information is then used to access important accounts such as Plaintiffs' and Class members' PII/PHI.

73.     Phishing does not just happen. To be successful, phishing relies on a series of affirmative acts by a company and its employees. This is because computers must be told what to do; they do not make independent decisions. Rather, they rely on instructions and actions from users and programmers. A successful phishing attack also requires an intentional affirmative act on the part of, for example, a company employee, such as clicking a link, downloading a file, or providing sensitive information.

74.     Phishing attempts are extremely common. According to the Anti-Phishing Working Group's ("APWG") Phishing Activity Trends Report for Q2 2020, the first half of the year saw 146,994 reported phishing attacks.[31] Verizon's 2020 Data Breach Investigation Report found that phishing is one of the top data breach threats, with 22 percent of data breaches involving phishing.

75.     Phishing is one-way identity thieves, scammers and fraudsters steal information. Comparitech explains the goal of phishing is to trick victims into divulging confidential or personal information that can then be used for fraudulent purposes, like identity theft.[32] The HIPAA Journal explains that phishing attacks on the healthcare industry typically have one of two objectives – to obtain access to PHI or to deliver ransomware. PHI is a valuable commodity on the black market because it can be used to create false identities, obtain free medical treatment, and commit insurance

---

[31]     https://docs.apwg.org/reports/apwg_trends_report_q2_2020.pdf
[32]     https://www.comparitech.com/blog/information-security/common-phishing-scams-how-to-avoid/

1   fraud. Thus, the goal of phishing is to obtain and use compromised data so that it may be used to

2   commit fraud.[33]

3        76.   The APWG describes phishing as a crime employing both social engineering and

4   technical subterfuge to steal personal identity data and account credentials. Social engineering

5   schemes prey on unwary victims by fooling them into believing they are dealing with a trusted,

6   legitimate party, such as by using deceptive email addresses and email messages. Phishing schemes

7   are designed to lead victims to counterfeit websites that trick recipients into divulging personal data

8   such as usernames and passwords. Technical subterfuge schemes plant malware onto computers to

9   steal credentials directly, often using systems that intercept victims' account usernames and

10   passwords or misdirect victims to counterfeit websites.

11        77.   The HIPPA Journal describes that most phishing attacks on the healthcare industry are

12   deployed by email. The communications generally look authentic and instruct employees to follow a

13   link to a web page – where they will be asked to complete some action that will trigger a malware

14   download or enter their username and password to continue. In addition to ransomware, the malware

15   may be in the form of surveillance software such as adware and keystroke loggers that can be

16   downloaded to follow an employee's online activities and record their usernames and passwords.

17   Other types of malicious software can be downloaded to create gateways for hackers to enter an

18   organization's network remotely. If the phishing attempt has been successful in obtaining a username

19   and password, the hacker will likely be able to access PHI almost immediately.[34]

20        78.   Phishing attacks are successful because a company has not employed adequate

21   security procedures such as (1) training employees on how to recognize and report phishing attacks

22   and conducting mock phishing scenarios; (2) deploying spam filters that can be enabled to recognize

23   and prevent emails from suspicious sources from ever reaching the inbox of employees; (3) keeping

24   all systems current with the latest security patches and updates; (4) installing antivirus solutions and

25   monitoring the antivirus status on all equipment; (5) developing a security policy that includes

26   password expiration and complexity and using two factor authentication to prevent hackers who have

27   _____

28   [33]   https://www.hipaajournal.com/protect-healthcare-data-from-phishing/
       [34]   *Id.*

KAZEROUNI LAW GROUP, APC

1   compromised a user's credentials from ever gaining access; (6) encrypting all sensitive company

2   information; (7) using only well-configured devices and employing good end point defenses that can

3   stop malware from installing, even if a phishing email is clicked; and (8) implementing policies and

4   procedures for responding quickly to incidents.

5          79.    Prior to the Data Breach, there were many reports of high-profile data breaches that

6   should have put a company like Defendant on high alert and forced it to closely examine its own

7   security procedures, as well as those of third parties with which it did business and gave access to

8   their subscriber PII/PHI.

9          80.    In 2019, a record 1,473 data breaches occurred, resulting in approximately

10  164,683,455 sensitive records being exposed, a 17% increase from 2018.  Of the 1,473 recorded data

11  breaches, 525 of them, or 35.64%, were in the medical or healthcare industry.  The 525 reported

12  breaches reported in 2019 exposed nearly 40 million sensitive records (39,378,157), compared to only

13  369 breaches that exposed just over 10 million sensitive records (10,632,600) in 2018.

14         81.    In light of recent high profile data breaches at other healthcare partner and provider

15  companies, including, American Medical Collection Agency (25 million patients, March 2019)

16  University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute

17  (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018),

18  Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians

19  (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), BJC Health System

20  (286,876 patients, March 2020), Defendant knew or should have known that Plaintiffs' and Class

21  members' electronic records would be targeted by cybercriminals.

22         82.    As such, Defendant was aware that PII/PHI is at high risk of theft, and consequently

23  should have but did not take appropriate and standard measures to safeguard Plaintiffs' and Class

24  members' PII/PHI against cyber-security attacks that Defendant should have anticipated and guarded

25  against, including a ransomware attack.

26         83.    At no point in time did Plaintiffs give written authorization for Defendant to reveal or

27  disclose Plaintiffs' PII/PHI to any other person, including Netgain. Plaintiffs were never informed

28

KAZEROUNI
LAW GROUP, APC

and never specifically consented to Plaintiffs' PII, PHI, and/or confidential medical information being disclosed to Netgain.

84. Pursuant to Cal. Civ. Code § 56.10(a), a provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care **without first obtaining an authorization**, except as provided in subdivision (b) or (c).

85. Subdivision (b) of Cal. Civ. Code § 56.10 provides an exhaustive list of circumstances under which Defendant *must* disclose medical information without prior authorization.

86. Subdivision (c) of Cal. Civ. Code § 56.10 provides an exhaustive list of circumstances under which Defendant *may* disclose medical information without prior authorization.

87. Neither subdivision (b) or (c) of Cal. Civ. Code § 56.10 include disclosing allowing access to Plaintiffs' and the Class members' medical information to an unauthorized vendor, such as Netgain, in connection with cloud computing or hosting activities, or other unidentified unauthorized persons as an exception to the mandatory authorization required under Cal. Civ. Code § 56.10(a).

88. Further, Cal. Civ. Code 56.10(d) states that unless "expressly authorized by a patient, enrollee, or subscriber, or as provided by subdivisions (b) and (c), a provider of health care . . . shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient."

89. "Authorization" is defined under the CMIA as obtaining permission in accordance with Cal. Civ. Code § 56.11 (or § 56.21 in the context of an employer disclosing medical information).

90. Defendant did not obtain valid authorization from as defined under Cal. Civ. Code § 56.11 of the CMIA prior to disclosing Plaintiffs' and the Class members' personal data, including PII, PHI and/or medical information to Netgain or other unidentified unauthorized third parties.

91. Through the above, Defendant recklessly failed to take adequate precautions to safeguard the confidential medical information of Plaintiffs and similarly situated members of the Class.

92. Through the above conduct, Defendant carelessly, recklessly, negligently, and impermissibly revealed Plaintiffs' and the Class members' sensitive PII/PHI to Netgain; and as a result of disclosing their personal data to Netgain, Defendant allowed and was the cause of Plaintiffs'

1  and the Class members' personal data, including PII, PHI, and medical information being accessed,

2  viewed, and acquired by unauthorized third parties.

3       93.     In selecting Defendant as a healthcare provider, Plaintiffs relied on Defendant to not

4  disclose their PII, PHI and/or confidential information to unauthorized third parties, including

5  Netgain, and entrusted Defendant to use adequate privacy and security provisions with regard to

6  Plaintiffs' PII and PHI.

7       94.     Even if Defendant had been permitted to disclose Plaintiffs' and Class Members' PII

8  and/or PHI to Netgain, which it was not, it was required and obligated to ensure that Netgain would

9  appropriately safeguard that information and to obtain assurances that Netgain would use the

10  information only for the purposes for which it was engaged, and would safeguard the information

11  from unauthorized access, disclosure, exfiltration, or misuse.

12      95.     When hiring and monitoring a service provider or business associate, Defendant knew

13  or should have known that it had a duty to inquire about potential service providers' and business

14  associates' cybersecurity programs and how such programs are maintained. Defendant knew or

15  should have known that it had a duty to compare potential service providers' and business associates'

16  cybersecurity programs to the industry standards adopted by other healthcare providers, and should

17  evaluate potential service providers' track records in the industry by reviewing public information

18  about data security incidents and litigation. Defendant knew or should have known that it had a duty

19  to also ask potential service providers and business associates about whether they have experienced

20  any cybersecurity incidents and how such incidents were handled, as well as whether the potential

21  service provider has an insurance policy in place that would cover losses caused by cybersecurity

22  breaches (including losses caused by internal and external threats). Defendant knew or should have

23  known that it had a duty to review service providers' and business associates' contracts to ensure that

24  the contracts require the service providers and business associates to comply, on an ongoing basis,

25  with cybersecurity and information security standards (and avoid contract provisions that limit service

26  providers' responsibility for cybersecurity and information technology breaches). Finally, Defendant

27  knew or should have known that it had a duty to pay particular attention to contract terms relating to

28  confidentiality, the use and sharing of information, notice by the vendor of cybersecurity risk

KAZEROUNI
LAW GROUP, APC

assessments and audit reports, cybersecurity breaches and records retention and destruction.

96.    On information and belief,  Netgain did not comply with industry standards or maintain an appropriate cybersecurity or information security program sufficient to safeguard Plaintiffs' and the Class Members' PII/PHI from unauthorized access, disclosure, exfiltration, or misuse.

97.    On information and belief, Defendant failed to do its necessary due diligence, did not sufficiently inquire about or review Netgain's cybersecurity programs and how such programs are maintained, or ensure that Netgain complied with  cybersecurity and information security standards; and, by breaching its duties, Defendant was negligent in selecting Netgain as a service provider or business associate.   Further, Defendant carelessly, recklessly, negligently, and impermissibly revealed Plaintiffs' and the Class members' sensitive PII/PHI to Netgain.

98.    Upon information and belief, Netgain has not provided verification or further information to Defendant regarding the disposition of the data to confirm that the stolen data has been recovered or destroyed, nor does Defendant or Netgain know whether the other unidentified unauthorized third parties who accessed and/or exfiltrated the data maintained the data in a manner to prevent others from accessing or acquiring Plaintiffs' and the Class members PII, PHI and/or medical information.

99.    Plaintiffs have been distressed by the fact that Defendant carelessly disclosed Plaintiffs' PII and PHI to unauthorized persons and failed to take adequate precautions to safeguard the confidential medical information of Plaintiffs and similarly situated members of the Class in violation of Cal. Civ. Code §§ 56, et seq.  Plaintiffs have suffered invasion of privacy, increased stress, embarrassment, humiliation, frustration, fear, and anxiety and bear an imminent and continuing increased risk of identity theft, including medical identity theft, as a result of Defendant's reckless exposure of Plaintiffs' PII and PHI unauthorized persons.

### *Plaintiffs and Class Members Suffered Damages*

100.    As a direct and proximate result of Defendant's wrongful actions and inaction and the resulting data breach, Plaintiffs and class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the

time which they otherwise would have dedicated to other life demands such as work and effort to mitigate the actual and potential impact of the data breach on their lives including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, changing the information used to verify their identity to information not subject to this data breach, and filing police reports.  This time has been lost forever and cannot be recaptured.  In all manners of life in this country, time has constantly been recognized as compensable.   In addition, Plaintiffs and Class members were subjected to continued and continuing risk of incurring unjustified expenses proximately resulting from the data breach including but not limited to purchasing extended credit monitoring and/or other remedial services to help minimize the risk of their PII and PHI being maliciously exposed and exploited, as well as expenses associated with unauthorized transactions resulting from malicious exposure and exploitation of their PII and PHI.

101.   Defendant's wrongful actions and inaction directly and proximately caused the exfiltration, theft, and dissemination to unauthorized cybercriminals of Plaintiffs' and Class members' PII and PHI, causing them to suffer, and to continue to suffer, invasion of privacy, economic damages and other actual harm for which they are entitled to compensation, including:

(a) Identity theft and fraud resulting from the theft of their PII and/or PHI;

(b) Costs for credit monitoring, identity theft protection services, and other costs associated with the detection and prevention of identity theft and unauthorized use of their PII and/or PHI;

(c) Unauthorized use of their PII and/or PHI to commit medical insurance, social security, and/or financial fraud; unauthorized charges on their debit and credit card accounts; and the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII and PHI being placed in the hands of criminals and already misused via the sale of Plaintiffs and class members' PII and PHI on the Internet, dark web, and/or black market;

(d) Anxiety and emotional distress;

(e) Loss and invasion of privacy;

(f)  Loss of the value of the explicit and implicit promises of data security;

(g)  Untimely and inadequate notification of the data breach;

(h)  Improper disclosure of patient medical information;

(i)  Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach;

(j)  Ascertainable losses in the form of deprivation of the value of their PII and PHI, for which there is a well-established national and international market;

(k)  Loss of use of, control of, and/or access to their PII and/or PHI and costs associated with adverse effects on their credit including fraud and adverse credit notations; and

(l)  Loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the data breach, including medical and insurance fraud, social security fraud, finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, changing the information used to verify their identity to information not subject to this data breach, and the stress, nuisance, and annoyance of dealing with all such issues resulting from the data breach.

## CLASS DEFINITION AND ALLEGATIONS

102.   Pursuant to Cal. Code Civ. Proc. § 382 and Cal. Civ. Code § 1781, Plaintiffs seek to represent and intend to certify the following class:

> All residents of California whose PII and/or PHI was compromised in the Data Breach disclosed by Defendant's Letter (the "Class").

103.   Excluded from the Class are: (1) Defendant and its officers, directors, employees, principals, affiliated entities, controlling entities, agents, and other affiliates; (2) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (3) the Judge(s) assigned to this case and any members of their immediate families.

104.    Certification of Plaintiffs' claims for class wide treatment is appropriate because Plaintiffs can prove the elements of the claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

105.    The Class members are so numerous and geographically dispersed throughout California that joinder of all Class members would be impracticable. While the exact number of class members is unknown, Defendant acknowledges the Data Breach, and reports estimate the breach to include approximately 115,448 patients, including Plaintiffs and Class members. Plaintiffs therefore believe that the Class is so numerous that joinder of all members is impractical.

106.    Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII/PHI compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

107.    There is a well-defined community of interest in the common questions of law and fact affecting Class members. The questions of law and fact common to Class members predominate over questions affecting only individual Class members, and include without limitation:

      a.  Whether Defendant participated in or committed the wrongful conduct alleged herein;

      b.  Whether Defendant's acts, transactions, or course of conduct constitute the violations of law alleged herein;

      c.  Whether Plaintiffs and the members of the Class sustained and/or continue to sustain damages attributable to Defendant's conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

      d.  Whether Plaintiffs and Class Members are entitled to recover compensatory damages, punitive damages, and/or statutory or civil penalties as a result of the data breach; and

e. Whether Plaintiffs and Class members are entitled to equitable relief, including injunctive relief and/or equitable relief.

108. Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that Plaintiffs have no interests adverse to or that conflict with the Class Plaintiffs seeks to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

109. A class action is superior to any other available method for the fair and efficient adjudication of this controversy since individual joinder of all Class members is impractical. Furthermore, the expenses and burden of individual litigation would make it difficult or impossible for the individual members of the Class to redress the wrongs done to them, especially given that the damages or injuries suffered by each individual member of the Class are outweighed by the costs of suit. Even if the Class members could afford individualized litigation, the cost to the court system would be substantial and individual actions would also present the potential for inconsistent or contradictory judgments. By contrast, a class action presents fewer management difficulties and provides the benefits of single adjudication and comprehensive supervision by a single court.

110. Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive, including public injunctive relief, and declaratory relief with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**
**Violation of California's Customer Records Act ("CRA")**
**(California Civil Code § 1798.80 et seq.; § 1798.82)**

111. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

112. California Civil Code § 1798.82 provides that "(a) A person or business that conducts business in California, and that owns or licenses computerized data that includes personal information shall disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California (1) whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person, or, (2)

whose encrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person and the encryption key or security credential was, or is reasonably believed to have been, acquired by an unauthorized person and the agency that owns or licenses the encrypted information has a reasonable belief that the encryption key or security credential could render that personal information readable or usable. The disclosure shall be made *in the most expedient time possible and without unreasonable delay*, consistent with the legitimate needs of law enforcement . . . ." California Civil Code §1798.82(a) (Emphasis added).

113.    Pursuant to California Civil Code § 1798.82(b), "A person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of the breach of the security of the data *immediately following discovery*, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." California Civil Code § 1798.82(b) (Emphasis added).

114.    Pursuant to California Civil Code § 1798.82(g) "breach of the security of the system" includes "unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of personal information maintained by the person or business."

115.    The CRA clearly defines the required standard of conduct relative to notice of a data breach involving personal information.

116.    In enacting § 1798.82, the California Legislature noted that "[a]ccording to the Attorney General, victims of identity theft must act quickly to minimize the damage; therefore expeditious notification of possible misuse of a person's personal information is imperative." 2002 Cal. Legis. Serv. Ch. 95 (SB 1386) at Section 1(e).

117.    Under California Civil Code § 1798.80(a), "Business" means a "sole proprietorship, partnership, corporation, association, or other group, however organized and whether or not organized to operate at a profit, including a financial institution organized, chartered, or holding a license or authorization certificate under the law of this state, any other state, the United States, or of any other country, or the parent or the subsidiary of a financial institution." As a non-profit corporation, LifeLong is a "business" within the meaning of § 1798.80(a).

118.    "Personal information" means any information that identifies, relates to, describes, or is capable of being associated with, a particular individual, including, but not limited to, his or her name, signature, social security number, physical characteristics or description, address, telephone number, passport number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information.  California Civil Code § 1798.80(e).

119.    Plaintiffs and Class Members are "customer[s]" within the meaning of the Civil Code § 1798.80(c) "who provide[d] personal information to [Defendant] for the purpose of . . . obtaining a service from the business."  The PII and PHI retained by Defendant constitutes "personal information" as defined in Civil Code § 1798.80(e).

120.    Defendant failed to provide timely notice required by California Civil Code § 1798.82(a) and/or (b) to Plaintiffs and the Class.

121.    California Civil Code § 1798.82 was intended to prevent the type of harm that Defendant's failure to provide timely notice caused.

122.    Plaintiffs and Class Members are California residents who provided personal information, including but not limited to PII and PHI, within the meaning of the CRA, to the Defendant. They are therefore members of the class of persons the statute was designed to protect.

123.    Defendant's failure to comply with this statute proximately caused injury to Plaintiffs and the Class because Defendant did not notify Plaintiffs and the Class that their PII and PHI had been unlawfully accessed by unauthorized cybercriminals until approximately six months after being apprised that a data breach had occurred.

124.    If Plaintiffs and Class Members had been notified of the data breach earlier, they could have taken earlier steps to mitigate the dangers from their information being stolen.   The unreasonable, six-month delay in notifying affected individuals after LifeLong knew of the data breach harmfully exposed the PII and PHI of Plaintiffs and the Class to substantially increased risk of identity theft and fraud.

125.    As a direct and proximate result of Defendant's unreasonable delay in notifying Plaintiffs and Class of the data breach, Plaintiffs and the Class have suffered and will continue to suffer damages as described above and continue to bear the risks of further exposure of their PII and PHI.

126.    Plaintiffs, on behalf of themselves and the Class, seek relief pursuant to Cal. Civ. Code § 1798.84(b), requesting relief as described below.

## SECOND CAUSE OF ACTION

**Violation of the California Confidentiality of Medical Information Act ("CMIA")**
**(Cal. Civ. Code §§ 56, *et seq.*)**
(*Unauthorized Disclosure of Medical Information*)

127.    Plaintiffs re-allege and incorporate by reference all proceeding paragraphs as if fully set forth herein.

128.    Section 56.10(a) of the California Civil Code provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization[.]"

129.    Defendant  is a "contractor" within the meaning of Civil Code § 56.05(d) and/or a "provider of healthcare" within the meaning of Civil Code § 56.06 and/or a "business organized for the purpose of maintaining medical information" and/or a "business that offers software or hardware to consumers . . . that is designed to maintain medical information" within the meaning of Civil Code § 56.06(a) and (b), and maintained and continues to maintain "medical information," within the meaning of Civil Code § 56.05(j), for "patients" of Defendant, within the meaning of Civil Code § 56.05(k).

130.    Plaintiffs and all members of the Class are "patients" within the meaning of Civil Code § 56.05(k) and are "endanger[ed]" within the meaning of Civil Code § 56.05(e) because Plaintiffs and the Class fear that disclosure of their medical information could subject them to harassment or abuse.

131.    Plaintiffs and the respective Class members, as patients, had their PHI, or "medical information," within the meaning of Civil Code § 56.05(j), created, maintained, preserved, and stored by Defendant.

132.    At all relevant times, Defendant had a legal duty to protect the confidentiality of Plaintiffs' personal information and medical information.

133.    In violation of Civil Code § 56.10(a), Defendant disclosed Plaintiffs' and the Class members' medical information without first obtaining an authorization. Plaintiffs' and the Class members' medical information was viewed by unauthorized parties or individuals, including Netgain, as a direct and proximate result of Defendant's violation of Civil Code § 56.10(a).

134.    In violation of Civil Code § 56.10(e), Defendant further disclosed Plaintiffs' and the Class members' medical information to persons or entities not engaged in providing direct health care services to Plaintiffs or the Class members or their providers of health care or health care service plans or insurers or self-insured employers.

135.    As a result of Defendant's above-described conduct, Plaintiffs and the Class have suffered damages from the unauthorized disclosure and release of their "medical information" made unlawful by Civil Code § 56.10.

136.    As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, and violation of the CMIA, Plaintiffs and the Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk of identity theft, identity fraud and medical fraud – risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII/PHI, (iv) statutory damages under the California CMIA, (v) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

137.    Plaintiffs, individually, and on behalf of all Class Members, pursuant to Civil Code § 56.35, seek compensatory damages, punitive damages of $3,000 per person, attorney's fees of $1,000 per person, and the costs of litigation.

138.    Plaintiffs also seek injunctive relief through an order requiring Defendant to cease its violations of the Civil Code §§ 56, et seq. Among other things, Defendant should be required to cease unauthorized disclosures of its patients' medical information

139.    Plaintiffs also seek further relief as described below.

### THIRD CAUSE OF ACTION

**Violation of the California Confidentiality of Medical Information Act ("CMIA")**
**(Cal. Civ. Code §§ 56, *et seq.*)**
(*Failure to Preserve Confidentiality of Medical Information*)

140.    Plaintiffs re-allege and incorporate by reference all proceeding paragraphs as if fully set forth herein.

141.    Defendant violated Civil Code § 56.101 of the CMIA through its failure to maintain and preserve the confidentiality of the medical information of Plaintiffs and the Class.

142.    In violation of Civil Code § 56.101(a), Defendant created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiffs' and the Class members' medical information in a manner that failed to preserve and breached the confidentiality of the information contained therein. Plaintiffs' and the Class members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendant's violation of Civil Code § 56.101(a).

143.    In violation of Civil Code § 56.101(a), Defendant negligently created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiffs' and the Class members' medical information. Plaintiffs' and the Class members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendant's violation of Civil Code § 56.101(a).

144.    As a result of Defendant's above-described conduct, Plaintiffs and the Class have suffered damages from the unauthorized release of their "medical information" made unlawful by Civil Code § 56.101.

145.    As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, and violation of the CMIA, Plaintiffs and the Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk of identity theft, identity fraud and medical fraud – risks

1   justifying expenditures for protective and remedial services for which they are entitled to

2   compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII/PHI,

3   (iv) statutory damages under the California CMIA, (v) deprivation of the value of their PII/PHI, for

4   which there is a well-established national and international market, and/or (vi) the financial and

5   temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their

6   damages.

7      146.    Plaintiffs' and the Class members' medical information that was the subject of the

8   Data Breach included "electronic medical records" or "electronic health records" as referenced by

9   Civil Code § 56.101(c) and defined by 42 U.S.C. § 17921(5).

10     147.    Defendant violated Civil Code § 56.36 of the CMIA through its failure to maintain

11  and preserve the confidentiality of the medical information of Plaintiffs and the Class.

12     148.    Plaintiffs, individually and for each member of the Class, seeks nominal damages of

13  one thousand dollars ($1,000) for each violation under Civil Code § 56.36(b)(1), and actual damages

14  suffered, if any, pursuant to Civil Code § 56.36(b)(2), injunctive relief.

15     149.    Plaintiffs also seek injunctive relief through an order requiring Defendant to cease its

16  violations of the Civil Code §§ 56, et seq. Among other things, Defendant should be required to cease

17  negligently handling its patients' medical information.

18     150.    Plaintiffs also seek further relief as described below.

19                       **FOURTH CAUSE OF ACTION**
           **Violation of the California Unfair Competition Law ("UCL")**
20                  **(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

21     151.    Plaintiffs re-allege and incorporate by reference all proceeding paragraphs as if fully

22  set forth herein.

23     152.    The UCL prohibits any "unlawful," "fraudulent" or "unfair" business act or practice

24  and any false or misleading advertising, as those terms are defined by the UCL and relevant case law.

25  By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care

26  that directly and proximately caused the Data Breach, Defendant engaged in unlawful, unfair and

27  fraudulent practices within the meaning, and in violation of, the UCL.

28

153.   In the course of conducting its business, Defendant committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiffs' and Class members' PII/PHI, and by violating the statutory and common law alleged herein, including, *inter alia*, California's Confidentiality of Medical Information Act (Civ. Code §§ 56.10(a), (e); 56.101(a), 56.101(b)(1)(A); 56.36), California Consumer Privacy Act of 2018 (Cal. Civ. Code § 1798.150(a)(1)), the Health Insurance Portability and Accountability Act of 1996, (42 U.S.C. § 1302d; 45 C.F.R. §§ 164.306(a), (d), (e); 164.308(a); 164.312(a), (d), (e); 164.316(a), (b)), Civil Code § 1798.81.5, and Article I, Section 1 of the California Constitution (California's constitutional right to privacy). Plaintiffs and Class members reserve the right to allege other violations of law by Defendant constituting other unlawful business acts or practices. Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

154.   Defendant also violated the UCL's unlawful prong by breaching contractual obligations created by its Privacy Policy and by knowingly and willfully or, in the alternative, negligently and materially violating Cal. Bus. & Prof. Code § 22576, which prohibits a commercial website operator from "knowingly and willfully" or "negligently and materially" failing to comply with the provisions of their posted privacy policy. Plaintiffs and Class members suffered injury in fact and lost money or property as a result of Defendant's violations of its Privacy Policy.

155.   Defendant also violated the UCL by failing to adequately and timely notify Plaintiffs and Class members pursuant to Civil Code § 1798.82(a) regarding the unauthorized access and disclosure of their PII. If Plaintiffs and Class members had been adequately and timely notified in an appropriate fashion, they could have taken precautions to safeguard and protect their PII/PHI and identities.

156.   Defendant's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendant's wrongful conduct is substantially injurious to

consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendant's practices are also contrary to legislatively declared and public policies that seek to protect PII/PHI and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CCPA, Article I, Section 1 of the California Constitution, and the FTC Act (15 U.S.C. § 45). The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

157.   Plaintiffs and Class members suffered injury in fact and lost money or property as a result of Defendant's violations of its Privacy Policy and statutory and common law in that a portion of the money Plaintiffs and Class members paid for Defendant's products and services went to fulfill the contractual obligations set forth in its Privacy Policy, including maintaining the security of their PII/PHI, and Defendant's legal obligations and Defendant failed to fulfill those obligations.

158.   The UCL also prohibits any "fraudulent business act or practice." Defendant's above-described claims, nondisclosures and misleading statements were false, misleading and likely to deceive the consuming public in violation of the UCL.

159.   As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and their violations of the UCL, Plaintiffs and Class members have suffered injury in fact and lost money or property as a result of Defendant's unfair and deceptive conduct. Such injury includes paying for a certain level of security for their PII/PHI but receiving a lower level, paying more for Defendant's products and services than they otherwise would have had they known Defendant was not providing the reasonable security represented in its Privacy Policy and as in conformance with its legal obligations. Defendant's security practices have economic value in that reasonable security practices reduce the risk of theft of patient's PII/PHI.

160.   Plaintiffs and Class members have also suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk of identity theft and identity fraud – risks justifying expenditures for

1    protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy,

2    (iii) breach of the confidentiality of their PII/PHI, (iv) statutory damages under the CCPA,

3    (v) deprivation of the value of their PII/PHI for which there is a well-established national and

4    international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring

5    financial accounts, and mitigating damages.

6        161.    Unless restrained and enjoined, Defendant will continue to engage in the above-

7    described wrongful conduct and more data breaches will occur. Plaintiffs, therefore, on behalf of

8    themselves, Class members, and the general public, also seek restitution and an injunction, including

9    public injunctive relief prohibiting Defendant from continuing such wrongful conduct, and requiring

10   Defendant to modify its corporate culture and design, adopt, implement, control, direct, oversee,

11   manage, monitor and audit appropriate data security processes, controls, policies, procedures

12   protocols, and software and hardware systems to safeguard and protect the PII/PHI entrusted to it, as

13   well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

## FIFTH CAUSE OF ACTION

### Breach of Contract

16       162.    Plaintiffs re-allege and incorporate by reference all proceeding paragraphs as if fully

17   set forth herein.

18       163.    Plaintiffs and Class members entered into express contracts with Defendant as set forth

19   in its Terms of Use and Privacy Policy that included Defendant's promise to protect nonpublic

20   personal information given to Defendant or that Defendant gathered on its own, from disclosure, as

21   set forth in Defendant's Privacy Policy, which was posted on its website.

22       164.    Plaintiffs and Class members performed their obligations under the contracts when

23   they provided their PII/PHI to Defendant in relation to their purchase of products or services from

24   Defendant.

25       165.    Defendant's Privacy Policy promises that it "takes appropriate security measures to

26   prevent unauthorized access, disclosure, modification, or unauthorized destruction of the Data."

27       166.    These contractual obligations under its "Terms or Use and Privacy Policy" were

28   breached by Defendant when it failed to reasonably safeguard and protect Plaintiffs' and Class

Members' PII and PHI, which was compromised as a result of the data breach, and by failing to timely notify Plaintiffs and Class Members of the data breach.

167.    By allowing unauthorized users to gain access to Plaintiffs' and Class members' PII/PHI through the Data Breach, Defendant breached these contractual obligations. As a result, Defendant failed to comply with its own policies, including its Privacy Policy, and applicable laws, regulations and industry standards for data security and protecting the confidentiality of PII/PHI.

168.    Defendant's breach of contract also violated California Business and Professions Code § 22576, which prohibits a commercial website operator from "knowingly and willfully" or "negligently and materially" failing to comply with the provisions of their posted privacy policy.

169.    By failing to fulfill its contractual obligations under its Terms of Use and Privacy Policy, Defendant failed to confer on Plaintiffs and Class members the benefit of the bargain, causing them economic injury.

170.    As a direct and proximate result of the Data Breach, Plaintiffs and Class members have been harmed and have suffered, and will continue to suffer, damages and injuries.

### SIXTH CAUSE OF ACTION

**Breach of Implied Contract**

171.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

172.    Plaintiffs and Class Members were required to provide their PII and PHI to Defendant in order to receive health care services and treatments.

173.    As part of these transactions, Defendant agreed to safeguard and protect the PII and PHI of Plaintiffs and class members. Implicit in these transactions was the obligation that Defendant would use the PII and PHI for approved business purposes only and would not make unauthorized disclosures of the information or allow unauthorized access to the information.

174.    Additionally, Defendant implicitly promised to retain this PII and PHI only under conditions that kept such information secure and confidential and therefore had a duty to reasonably safeguard and protect the PII and PHI of Plaintiffs and Class Members from unauthorized disclosure or access.

175.    Plaintiffs and Class Members entered into implied contracts with Defendant with the reasonable expectation that Defendant's data security practices and policies were adequate and consistent with healthcare industry standards.

176.    Plaintiffs and Class Members believed that Defendant would provide adequate and reasonable data security practices to protect their PII and PHI and would provide accurate and timely notice if such information was compromised, lost, or stolen.

177.    Plaintiffs and Class Members would not have provided and entrusted their PII and PHI to Defendant in the absence of the implied contracts between them and Defendant whereby Defendant would provide adequate and reasonable data security practices to protect their PII and PHI and would provide accurate and timely notice if such information was compromised, lost, or stolen.

178.    Plaintiffs and the Class Members affected by the Data Breach entrusted Defendant to use adequate privacy and security provisions with regard to their PII and/or PHI, with the reasonable understanding that their information would be kept confidential, not disclosed without authorization, and not stored negligently.

179.    Defendant's Terms of Use and Privacy Policy were part and parcel of Defendant's offer of services to Plaintiffs and the Class Members.

180.    Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant.

181.    Defendant breached its implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' PII and PHI, which was compromised as a result of the data breach, and by failing to time timely notify Plaintiffs and Class Members of the data breach.

182.    As a direct and proximate result of Defendant's breaches of its implied contracts with Plaintiffs and Class Members, Plaintiffs and Class Members sustained actual losses and damages as described herein, and will continue to suffer damages for, potentially, years to come.

### SEVENTH CAUSE OF ACTION

### Negligence

183.    Plaintiffs re-allege and incorporate by reference all proceeding paragraphs as if fully set forth herein.

184.    Defendant owed various duties to Plaintiffs and the Class, including pursuant to the CMIA, as alleged in detail above.  Specifically, Defendant owed a duty to Plaintiffs and the Class with regard to its manner of collection and maintenance of Plaintiffs and the Class members' personal data, including PHI, PII, and medical information.

185.    Defendant breached Defendant's respective duties by engaging in the conduct and omissions alleged above and in violation of the CMIA.

186.    Defendant is both the actual and legal cause of Plaintiffs and the Class' damages.

187.    Plaintiffs believe and thereon allege that as a proximate result of Defendant's negligence, Plaintiffs and the Class have suffered actual damages and significant emotional distress as described herein and above.

188.    Due to the egregious violations alleged herein, Plaintiffs asserts that Defendant breached Defendant's respective duties in an oppressive, malicious, despicable, gross, and wantonly negligent manner. Defendant's conscious disregard for Plaintiffs' privacy rights entitles Plaintiffs and the Class to recover punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves individually and all members of the Class, respectfully request that (i) this action be certified as a class action, (ii) Plaintiffs be designated representatives of the certified class(es), and (iii) Plaintiffs' undersigned counsel be appointed as Class Counsel. Plaintiffs, on behalf of themselves and members of the Class, further request that upon final trial or hearing, judgment be awarded against Defendant for:

(i)     actual and punitive damages to be determined by the trier of fact;

(ii)    statutory and nominal damages;

(iii)   equitable relief, including restitution;

(iv)    appropriate injunctive relief;

(v)     punitive damages;

(vi)    attorneys' fees and litigation expenses under Code of Civil Procedure § 1021.5 and other applicable law;

(vii)   pre- and post-judgment interest at the highest legal rates applicable; and

(viii)   any such other and further relief the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves individually and the putative Class, hereby demand a jury trial on all issues so triable.

Dated: December 23, 2022                    Respectfully submitted,

**KAZEROUNI LAW GROUP, APC**

By: _____
Abbas Kazerounian, Esq.
Mona Amini, Esq.
Gil Melili, Esq.
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808 / Fax:  (800) 520-5523
ak@kazlg.com
mona@kazlg.com
gil@kazlg.com

**HAMMONDLAW, P.C.**

By: ___s/ Julian Hammond_____
Julian Hammond (SBN 268489)
jhammond@hammondlawpc.com
Polina Brandler (SBN 269086)
pbrandler@hammondlawpc.com
Ari Cherniak (SBN 290071)
acherniak@hammondlawpc.com
Adrian Barnes (SBN 253131)
abarnes@hammondlawpc.com
1201 Pacific Ave, Suite 600
Tacoma, Washington 98402
Telephone: (310) 601-6766 / Fax:  (310) 295-2385

*Attorneys for Plaintiffs and the Proposed Class*

# EXHIBIT A

August 24, 2021

## LifeLong Medical Care Provides Notice of Netgain Data Security Incident

The privacy and security of personal information is of the utmost importance to LifeLong Medical Care. On November 24, 2020, Netgain, a third-party vendor that provides services to certain healthcare providers, including LifeLong, discovered anomalous network activity. Through Netgain's investigation, it was later determined that Netgain was the victim of a ransomware attack.

On February 25, 2021, Netgain's investigation determined that certain files were accessed and/or acquired without authorization. Thereafter, LifeLong Medical Care conducted a thorough review of the contents of the acquired files to determine if they contained any sensitive information. Based on LifeLong Medical Care's comprehensive investigation and document review, LifeLong Medical Care discovered on August 9, 2021 that certain identifiable personal and protected health information was accessed and/or acquired from Netgain's network in connection with this incident, including full names and one or more of the following: Social Security numbers, dates of birth, patient cardholder numbers, and/or treatment/diagnosis information.

To date, LifeLong Medical Care is not aware of any reports of identity fraud or improper use of any information as a direct result of this incident. LifeLong Medical Care is providing notification of this incident commencing on August 24, 2021. Impacted individuals should consider taking steps to protect their information, including enrolling in complimentary credit monitoring services (if their Social Security number was impacted), placing a fraud alert/security freeze on their credit files, obtaining free credit reports, and remaining vigilant in reviewing financial account statements, credit reports and explanation of benefits statements for fraudulent or irregular activity.

At LifeLong Medical Care, protecting the privacy of personal information is a top priority. As part of LifeLong Medical Care's ongoing commitment to the security of information, we are working with our third-party vendors to enhance security and oversight.

**Individuals with questions concerning this incident may call a dedicated and confidential toll-free response line that LifeLong Medical Care has set up to respond to questions at (855) 851-1278. The response line is available Monday through Friday, 6 a.m. to 6 p.m. Pacific Time.**

\*\*\*

# EXHIBIT B



Return Mail Processing Center
PO Box 6336
Portland, OR 97228-6336



*IMPORTANT INFORMATION*
*PLEASE REVIEW CAREFULLY*

Dear ██████

We are writing with important information regarding a recent security incident that occurred at Netgain, a third-party vendor that provides services to certain healthcare providers, including LifeLong Medical Care. We wanted to provide you with information about the incident, explain the services we are making available to you, and let you know that we continue to take significant measures to protect your information.

*What Happened?*

On November 24, 2020, Netgain discovered anomalous network activity. Through Netgain's investigation, it was later determined that Netgain was the victim of a ransomware attack. On February 25, 2021, Netgain's investigation determined that certain files were accessed and/or acquired without authorization. Thereafter, LifeLong Medical Care conducted a thorough review of the contents of the acquired files to determine if they contained any sensitive information.

*What Information Was Involved.*

Based on LifeLong Medical Care's comprehensive investigation and document review, we discovered on August 9, 2021 that your full name and the following information were accessed and/or acquired from Netgain's network in connection with this incident: ███████████████

*What You Can Do.*

To date, we are not aware of any reports of identity fraud or improper use of your information as a direct result of this incident. Out of an abundance of caution, we wanted to make you aware of the incident, explain the services we are making available to help safeguard you against identity fraud, and suggest steps that you should take as well. To protect you from potential misuse of your information, we are offering a complimentary one-year membership in Equifax® Credit Watch™ Gold. Equifax® Credit Watch™ Gold is completely free to you and enrolling in this program will not hurt your credit score. For more information on identity theft prevention and Equifax® Credit Watch™ Gold, including instructions on how to activate your complimentary one-year membership, please see the additional information provided in this letter.

This letter also provides other precautionary measures you can take to protect your personal information, including placing a Fraud Alert and/or Security Freeze on your credit files, and/or obtaining a free credit report. Additionally, you should always remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity on a regular basis. We have also offered suggestions for protecting your medical information.

*What We Are Doing.*

Data privacy and security are among LifeLong Medical Care's highest priorities. As part of LifeLong Medical Care's ongoing commitment to the security of information, we are working with our third-party vendors to enhance security and oversight.

AE1781 v.03

*For More Information.*

Please accept our apologies that this incident occurred.

**If you have any further questions regarding this incident, please call our dedicated and confidential toll-free response line that we have set up to respond to questions at** ▮▮▮▮▮▮▮. This response line is staffed with professionals familiar with this incident and knowledgeable on what you can do to protect against misuse of your information. The response line is available Monday through Friday, 6:00 a.m. to 6:00 p.m. Pacific Time, except holidays.

Sincerely,

LifeLong Medical Care

## – OTHER IMPORTANT INFORMATION –

**1.**  **Enrolling in Complimentary 12-Month Credit Monitoring.**



**Activation Code:** ▮▮▮▮▮▮▮
**Activation Deadline:** ▮▮▮▮▮▮▮

**Equifax Credit Watch™ Gold**
   *Note: You must be over age 18 with a credit file to take advantage of the product

**Key Features**
- Credit monitoring with email notifications of key changes to your Equifax credit report
- Daily access to your Equifax credit report[1]
- WebScan notifications[1] when your personal information, such as Social Security Number, credit/debit card or bank account numbers are found on fraudulent Internet trading sites
- Automatic fraud alerts[2], which encourages potential lenders to take extra steps to verify your identity before extending credit, plus blocked inquiry alerts and Equifax credit report lock[3]
- Identity Restoration to help restore your identity should you become a victim of identity theft, and a dedicated Identity Restoration Specialist to work on your behalf
- Up to $1,000,000 of identity theft insurance coverage for certain out of pocket expenses resulting from identity theft[4]

**Enrollment Instructions**
   Go to *www.equifax.com/activate*
   Enter your unique Activation Code of ▮▮▮▮▮▮▮ then click "Submit" and follow these 4 steps:

1. **Register:**
   Complete the form with your contact information and click "Continue".
   *If you already have a myEquifax account, click the 'Sign in here' link under the "Let's get started" header. Once you have successfully signed in, you will skip to the Checkout Page in Step 4*
2. **Create Account:**
   Enter your email address, create a password, and accept the terms of use.
3. **Verify Identity:**
   To enroll in your product, we will ask you to complete our identity verification process.
4. **Checkout:**
   Upon successful verification of your identity, you will see the Checkout Page.
   Click 'Sign Me Up' to finish enrolling.
   **You're done!**
   The confirmation page shows your completed enrollment.
   Click "View My Product" to access the product features.

---

[1] *WebScan searches for your Social Security Number, up to 5 passport numbers, up to 6 bank account numbers, up to 6 credit/debit card numbers, up to 6 email addresses, and up to 10 medical ID numbers. WebScan searches thousands of Internet sites where consumers' personal information is suspected of being bought and sold, and regularly adds new sites to the list of those it searches. However, the Internet addresses of these suspected Internet trading sites are not published and frequently change, so there is no guarantee that we are able to locate and search every possible Internet site where consumers' personal information is at risk of being traded.*

[2] *The Automatic Fraud Alert feature is made available to consumers by Equifax Information Services LLC and fulfilled on its behalf by Equifax Consumer Services LLC.*

[3] *Locking your Equifax credit report will prevent access to it by certain third parties. Locking your Equifax credit report will not prevent access to your credit report at any other credit reporting agency. Entities that may still have access to your Equifax credit report include: companies like Equifax Global Consumer Solutions, which provide you with access to your credit report or credit score, or monitor your credit report as part of a subscription or similar service; companies that provide you with a copy of your credit report or credit score, upon your request; federal, state and local government agencies and courts in certain circumstances; companies using the information in connection with the underwriting of insurance, or for employment, tenant or background screening purposes; companies that have a current account or relationship with you, and collection agencies acting on behalf of those whom you owe; companies that authenticate a consumer's identity for purposes other than granting credit, or for investigating or preventing actual or potential fraud; and companies that wish to make pre-approved offers of credit or insurance to you. To opt out of such pre-approved offers, visit www.optoutprescreen.com*

[4] *The Identity Theft Insurance benefit is underwritten and administered by American Bankers Insurance Company of Florida, an Assurant company, under group or blanket policies issued to Equifax, Inc., or its respective affiliates for the benefit of its Members. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.*

**To sign up for US Mail delivery, dial 1-855-833-9162 for access to the Equifax Credit Watch automated enrollment process. Note that all credit reports and alerts will be sent to you via US Mail only.**

1. **Activation Code:** You will be asked to enter your enrollment code as provided at the top of this letter.
2. **Customer Information:** You will be asked to enter your home telephone number, home address, name, date of birth and Social Security Number.
3. **Permissible Purpose**: You will be asked to provide Equifax with your permission to access your Equifax credit file and to monitor your file. Without your agreement, Equifax cannot process your enrollment.
4. **Order Confirmation**: Equifax will provide a confirmation number with an explanation that you will receive your Fulfillment Kit via the US Mail (when Equifax is able to verify your identity) or a Customer Care letter with further instructions (if your identity can not be verified using the information provided). Please allow up to 10 business days to receive this information.

**2.**     **Placing a Fraud Alert on Your Credit File.**

Whether or not you choose to use the complimentary 12 month credit monitoring services, we recommend that you place an initial one-year "Fraud Alert" on your credit files, at no charge. A fraud alert tells creditors to contact you personally before they open any new accounts. To place a fraud alert, call any <u>one</u> of the three major credit bureaus at the numbers listed below. As soon as one credit bureau confirms your fraud alert, they will notify the others.

| **Equifax** | **Experian** | **TransUnion LLC** |
|---|---|---|
| P.O. Box 105069 | P.O. Box 2002 | P.O. Box 2000 |
| Atlanta, GA 30348 | Allen, TX 75013 | Chester, PA 19016 |
| www.equifax.com | www.experian.com | www.transunion.com |
| 1-800-525-6285 | 1-888-397-3742 | 1-800-680-7289 |

**3.**     **Consider Placing a Security Freeze on Your Credit File.**

If you are very concerned about becoming a victim of fraud or identity theft, you may request a "Security Freeze" be placed on your credit file, at no charge. A security freeze prohibits, with certain specific exceptions, the consumer reporting agencies from releasing your credit report or any information from it without your express authorization. You may place a security freeze on your credit report by contacting <u>all three</u> nationwide credit reporting companies at the numbers below and following the stated directions or by sending a request in writing, by mail, to <u>all three</u> credit reporting companies:

| **Equifax Security Freeze** | **Experian Security Freeze** | **TransUnion Security Freeze** |
|---|---|---|
| P.O. Box 105788 | P.O. Box 9554 | P.O. Box 2000 |
| Atlanta, GA 30348 | Allen, TX 75013 | Chester, PA 19016 |
| https://www.freeze.equifax.com | http://experian.com/freeze | http://www.transunion.com/securityfreeze |
| 1-800-349-9960 | 1-888-397-3742 | 1-888-909-8872 |

In order to place the security freeze, you'll need to supply your name, address, date of birth, Social Security number and other personal information. After receiving your freeze request, each credit reporting company will send you a confirmation letter containing a unique PIN (personal identification number) or password. Keep the PIN or password in a safe place. You will need it if you choose to lift the freeze.

If your personal information has been used to file a false tax return, to open an account or to attempt to open an account in your name or to commit fraud or other crimes against you, you may file a police report in the City in which you currently reside.

If you do place a security freeze *prior* to enrolling in the credit monitoring service as described above, you will need to remove the freeze in order to sign up for the credit monitoring service. After you sign up for the credit monitoring service, you may refreeze your credit file.

**4.**     **Obtaining a Free Credit Report.**

Under federal law, you are entitled to one free credit report every 12 months from <u>each</u> of the above three major nationwide credit reporting companies. Call **1-877-322-8228** or request your free credit reports online at **www.annualcreditreport.com**. Once you receive your credit reports, review them for discrepancies. Identify any accounts you did not open or inquiries from creditors that you did not authorize. Verify all information is correct. If you have questions or notice incorrect information, contact the credit reporting company.

**5.**     **Additional Helpful Resources.**

Even if you do not find any suspicious activity on your initial credit reports, the Federal Trade Commission (FTC) recommends that you check your credit reports periodically. Checking your credit report periodically can help you spot problems and address them quickly.

If you find suspicious activity on your credit reports or have reason to believe your information is being misused, call your local law enforcement agency and file a police report. Be sure to obtain a copy of the police report, as many creditors will want the information it contains to absolve you of the fraudulent debts. You may also file a complaint with the FTC by contacting them on the web at www.ftc.gov/idtheft, by phone at 1-877-IDTHEFT (1-877-438-4338), or by mail at Federal Trade Commission, Consumer Response Center, 600 Pennsylvania Avenue, NW, Washington, DC 20580. Your complaint will be added to the FTC's Identity Theft Data Clearinghouse, where it will be accessible to law enforcement for their investigations. In addition, you may obtain information from the FTC about fraud alerts and security freezes.

**North Carolina Residents:** You may obtain information about preventing identity theft from the North Carolina Attorney General's Office: Office of the Attorney General of North Carolina, Department of Justice, 9001 Mail Service Center, Raleigh, NC 27699-9001, www.ncdoj.gov/, Telephone: 877-566-7226.

6.       **Protecting Your Medical Information.**

We have no evidence that any medical information involved in this incident was or will be used for any unintended purposes. However, the following practices can provide additional safeguards to protect against medical identity theft.

- Only share your health insurance cards with your health care providers and other family members who are covered under your insurance plan or who help you with your medical care.

- Review your "explanation of benefits statement" which you receive from your health insurance company. Follow up with your insurance company or care provider for any items you do not recognize. If necessary, contact the care provider on the explanation of benefits statement and ask for copies of medical records from the date of the potential access (noted above) to current date.

- Ask your insurance company for a current year-to-date report of all services paid for you as a beneficiary. Follow up with the insurance company or the care provider for any items you do not recognize.

EXHIBIT C

Privacy Policy

1

## **PROOF OF SERVICE**

2
I am a resident of the State of California, over the age of eighteen years, and not a party to the
3
within action.  My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626.   On December 23, 2022, I served the foregoing document and
4
accompanying attachments by the means indicated below:

5

6
☒        ELECTRONIC SERVICE - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m.  The electronic
7
filing system sends an e-mail notification of the filing to the parties and counsel of record.

8

9
I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on December 23, 2022 at Costa Mesa, California.

10

11



12
MONA AMINI

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT